24CA1632 Allen v Board of Regents 12-24-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1632
El Paso County District Court No. 19CV31669
Honorable Michael P. McHenry, Judge

Russell Allen,

Plaintiff-Appellant,

v.

Board of Regents for the University of Colorado,

Defendant-Appellee.

JUDGMENT AND ORDER AFFIRMED

Division VI
Opinion by JUDGE SULLIVAN
Welling and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 24, 2025

Killmer Lane, LLP, Darold W. Killmer, Liana Orshan, Denver, Colorado; Richard LaFond, Boulder, Colorado; Robert M. Liechty PC, Robert M. Liechty, Denver, Colorado, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Megan Clark, Special Assistant Attorney General, Gabrielle Robbie, Special Assistant Attorney General, Denver, Colorado, for Defendant-Appellee

HKM Employment Attorneys LLP, Adam M. Harrison, Hayden G. DePorter, Denver, Colorado, for Amicus Curiae Colorado PELA

¶ 1     Plaintiff, Russell Allen, appeals the district court's judgment entered on the jury's verdict in favor of defendant, the Board of Regents for the University of Colorado (the University), and its order awarding the University costs.  We affirm.

## I.     Background

¶ 2     The University hired Allen as a catering chef and bakery manager at its Colorado Springs campus in 2016.  Two years later, the University hired Corey King as an associate director and executive chef.  King's duties included supervising Allen.

¶ 3     In October 2018, Allen reported King to the director of auxiliary financial services for allegedly misusing University equipment and systems to purchase and prepare food for personal purposes.  The University's internal audit department investigated the report and found that King didn't commit misconduct.

¶ 4     Before Allen submitted his whistleblower report, the University had documented issues with Allen's performance.  In 2017, the University had placed Allen on a performance improvement plan (PIP), which he had successfully completed.  And in September 2018, King had emailed Robin Margolin, his direct supervisor and

Allen's second-level supervisor, that he had been having issues with Allen's lack of professionalism.

¶ 5 After Allen submitted his whistleblower report, Margolin sent Anja Wynne, the human resources (HR) director, a list of over ten complaints that others had made against Allen. A vendor also emailed King, at King's request, with information about a phone call the vendor had with Allen during which Allen acted unprofessionally by berating and screaming profanities at the vendor (the vendor incident). A few days later, the University fired Allen.

## II. Procedural History

¶ 6 Allen sued the University, asserting claims for breach of an implied contract; promissory estoppel; and violation of Colorado's whistleblower statute, section 24-50.5-103(1), C.R.S. 2025. He also requested relief under 42 U.S.C. § 1983. The University moved to dismiss the breach of contract, promissory estoppel, and § 1983 claims. The district court granted that motion.

¶ 7 The University then moved for summary judgment on Allen's whistleblower claim. The district court granted that motion too.

¶ 8     Allen appealed the dismissal of the breach of contract and promissory estoppel claims and the grant of summary judgment to the University on the whistleblower claim. *See Allen v. Bd. of Regents*, (Colo. App. No. 21CA2055, Mar. 2, 2023) (not published pursuant to C.A.R. 35(e)) (*Allen I*). A division of this court affirmed the dismissal of the breach of contract and promissory estoppel claims but reversed the grant of summary judgment on the whistleblower claim. *Id.,* slip op. at ¶ 1.

¶ 9     After trial on the whistleblower claim on remand, the jury returned a verdict for the University. The jury found that Allen had made his whistleblower report in good faith, but the report wasn't a substantial or motivating factor in the University's decision to terminate him. The court entered judgment on the jury's verdict and awarded the University its costs.

¶ 10    On appeal, Allen challenges three evidentiary rulings by the district court as well as its order awarding the University costs.

### III.    Evidentiary Contentions

¶ 11    Turning first to Allen's evidentiary contentions, Allen argues the district court erred by excluding (1) his unemployment file; (2) certain University policies; and (3) evidence of a comparator

3

employee whom the University also terminated. We address each contention in turn.

## A. Applicable Law and Standard of Review

¶ 12 Under Colorado's whistleblower statute, an employer may not discipline an employee based on the employee's disclosure of protected information. § 24-50.5-103(1). Colorado courts analyze whistleblower claims using the three-step framework announced by the United States Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). *See, e.g., Ward v. Indus. Comm'n*, 699 P.2d 960, 967-68 (Colo. 1985); *Taylor v. Regents of Univ. of Colo.*, 179 P.3d 246, 248 (Colo. App. 2007). Under this framework, the plaintiff must first demonstrate that (1) they made a protected disclosure and (2) the disclosure was a "substantial or motivating factor" for the disciplinary action. *Ward*, 699 P.2d at 968. The burden then shifts to the defendant to establish that (3) it would have made the same decision absent the plaintiff's protected disclosure. *Id.* The University doesn't dispute that Allen made a protected disclosure under the first step.

¶ 13 Under the second step, relevant factors to determine whether the protected disclosure was a substantial or motivating factor for a

4

termination include the historical background of the employer's decision to terminate; the casual nexus between the protected activity and the employer's decision to terminate; the extent to which the employer departed from normal procedures or policies in reaching its decision; the pretextual character of the reasons advanced for termination; and the evidentiary support for the employer's asserted reasons for termination. *Johnson v. Jefferson Cnty. Bd. of Health*, 662 P.2d 463, 476 (Colo. 1983).

¶ 14    A plaintiff may show pretext, among other ways, based on inconsistencies in the employer's explanation for the termination decision. *See Williams v. Dep't of Pub. Safety*, 2015 COA 180, ¶ 56. As relevant here, the plaintiff may also present evidence that the employer acted contrary to either a written policy prescribing the action to be taken by the employer under the circumstances or an unwritten company policy or practice when making the decision to terminate. *See St. Croix v. Univ. of Colo. Health Scis. Ctr.*, 166 P.3d 230, 237 (Colo. App. 2007).

¶ 15    A plaintiff who attempts to show that the employer acted contrary to an unwritten policy or practice often does so by providing evidence that the employer treated them differently from

other similarly situated employees who violated work rules of comparable seriousness.  *Id.*  To be similarly situated, the employees must be subject to the same standards regarding performance, evaluation, and discipline.  *See id.*

¶ 16     Subject to certain exceptions, all relevant evidence is admissible.  CRE 402; *Mosley v. Daves*, 2025 COA 80, ¶ 45.  Evidence is relevant if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  CRE 401.  But relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  CRE 403.  In applying CRE 403, we afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected from the evidence.  *Kelly v. Haralampopoulos*, 2014 CO 46, ¶ 45; *Holley v. Huang*, 284 P.3d 81, 84 (Colo. App. 2011).

¶ 17    We review a district court's evidentiary rulings for an abuse of discretion. *Curry v. Brewer*, 2025 COA 28, ¶ 27. "A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law." *Id.*

¶ 18    On appeal, we disregard any error that is harmless — that is, error that doesn't affect the substantial rights of the parties. C.A.R. 35(c); C.R.C.P. 61; *Johnson v. Schonlaw*, 2018 CO 73, ¶ 11. An error doesn't affect a party's substantial rights if we can say with fair assurance that the error didn't substantially influence the outcome of the case or impair the basic fairness of the trial. *Schonlaw*, ¶ 11.

### B.    Unemployment File

¶ 19    We first address Allen's contention that the district court should have admitted Allen's unemployment file. The file included Allen's application to the Colorado Department of Labor and Employment's Division of Unemployment Insurance (the Unemployment Division) for unemployment benefits and information the University submitted opposing that application.

### 1. Additional Background

¶ 20      Before trial, the University moved to exclude Allen's unemployment file under CRE 402 and 403, among other grounds.

¶ 21      At a pretrial hearing, Allen argued that the court should admit the unemployment file to show pretext because the University provided information to the Unemployment Division that was false, incomplete, and inconsistent with the University's position in litigation. The University responded that the unemployment file was incomplete only because the University used an HR vendor to communicate with the Unemployment Division on the University's behalf, and, although the University sent all relevant information to the HR vendor, some information hadn't made it into Allen's unemployment file. The University argued that explaining this "triangle" relationship would confuse the jury and waste time. It also argued that the University had always maintained, both in its opposition to Allen's unemployment application and in litigation, that it fired Allen because he had a history of performance issues and unprofessional conduct that culminated with the vendor incident.

¶ 22   The court expressed concern that admitting the unemployment file would create a "sideshow" about a "collateral issue." But it deferred making a final ruling until trial.

¶ 23   On the morning of the first day of trial, the court excluded the unemployment file under CRE 403. It explained that the unemployment file's probative value was minimal and that explaining the context and the University's relationship with the HR vendor would confuse the issues for the jury. The court also found that the "extensive amount of overhead" necessary to adequately explain the issue to the jury would waste time.

¶ 24   On appeal, Allen again argues that the court should have admitted the unemployment file because it included false information the University submitted to the Unemployment Division that is inconsistent with evidence the University presented at trial. Specifically, Allen says the unemployment file wrongly suggested that the University warned Allen, afforded him a chance to fix his behavior, and fired him for violating the PIP.

### 2.   Analysis

¶ 25   Allen is correct that his unemployment file contains information suggesting that the University warned Allen and gave

him a chance to fix his behavior. He is also correct that both sides presented evidence at trial that Margolin never spoke to Allen about his behavior or the complaints against him before terminating his employment. Nevertheless, we conclude for four reasons that the court didn't abuse its discretion by excluding the unemployment file under CRE 403.

¶ 26    First, Allen doesn't explain how the University's inconsistent statements about whether it spoke to him and gave him a chance to fix his behavior demonstrate that its stated reasons for firing him were pretextual. *See Bird v. West Valley City*, 832 F.3d 1188, 1203 (10th Cir. 2016) ("Plaintiff's failure to develop [a] connection between th[e] anomaly [of irregularities in the process] and her termination, which was a separate disciplinary proceeding, means that th[e] alleged procedural irregularity is insufficient to establish pretext."). Indeed, while inconsistencies in an employer's *explanation* for firing an employee may be evidence of pretext, *see, e.g., Williams*, ¶ 56, Allen argues only that the University made inconsistent statements about the pretermination *procedures* he received. *See Farmer v. Turn Key Installation, L.L.C.*, 812 Fed. Appx. 200, 203 n.2 (5th Cir. 2020) ("Farmer fails to explain how being

informed that his services were no longer needed is inconsistent with Appellees' justification regarding his work behavior. Accordingly, we do not find conflicting explanations with regard to this employment decision.").

¶ 27 Second, the University consistently explained, both in the unemployment file and at trial, that it fired Allen due to his inappropriate and unprofessional behavior, culminating in the vendor incident. Thus, the unemployment file wasn't probative of whether the University provided pretextual reasons for firing Allen.

¶ 28 Third, even if the inconsistencies revealed by the unemployment file were minimally probative, we conclude the court acted within its discretion in determining that the risk of confusing the jury and wasting time outweighed the file's minimal probative value. *See* CRE 403. As the court noted, explaining to the jury the University's relationship with the HR vendor and why certain information the University sent to the HR vendor wasn't included in Allen's unemployment file would have required an "extensive amount of overhead," thus consuming limited trial time on what amounted to a mere "collateral matter." *See People v. Knight*, 167 P.3d 147, 153 (Colo. App. 2006) ("The trial court could reasonably

have concluded that this inquiry would have triggered a time-consuming and confusing foray into collateral and prejudicial matters and would have shed no light on the [relevant issue]."); *see also Smith v. Virgin Islands Port Auth.*, 457 Fed. Appx. 183, 187 (3d Cir. 2012) (The trial court had discretion "not to admit evidence from [the employee's] unemployment benefits hearing, which it determined would only confuse the proceedings."). On this record, we can't say the court's decision constituted an abuse of discretion.

¶ 29    Finally, while Allen's unemployment file included the PIP, the file didn't indicate that the University fired him for violating the PIP. *See Glover v. Serratoga Falls LLC*, 2021 CO 77, ¶¶ 40-45 (rejecting contention that was contradicted by the record as "simply incorrect"). To the contrary, the University consistently maintained that it fired Allen for inappropriate and unprofessional behavior.

¶ 30    Accordingly, we conclude that the district court didn't abuse its discretion by excluding Allen's unemployment file.

## C.    University Policies

¶ 31    We next address Allen's contention that the district court erred by excluding certain University policies.

¶ 32 At the outset, we recognize the University asserts that Allen preserved only some of his arguments regarding the court's exclusion of the University's policies. But because we ultimately conclude that Allen's policy-related arguments are unavailing, we need not decide whether he preserved each of his subarguments. *See In re Marriage of Mack*, 2022 CO 17, ¶ 12.

### 1. Additional Background

¶ 33 Before trial, the University moved to exclude the University's written "regent policies" under CRE 402 and 403. As relevant to this appeal, the written policies (1) "encouraged" members of the University community, including supervisors, to have "open and effective" communication on issues with the individuals directly involved before discussing the issues with others; (2) described certain dispute resolution procedures for personnel problems; (3) protected individuals who reported violations from retaliation; and (4) required the Board of Regents or its delegate to approve all terminations.

¶ 34 The district court granted the University's motion and excluded the policies under CRE 403. It explained that admitting the policies would be (1) tantamount to a "backdoor method" for

Allen to present his dismissed breach of contract claim and (2) likely to "cause confusion and waste time."

¶ 35     On the morning of the first day of trial, the court precluded Allen's counsel from asking witnesses about the policies because they impliedly raised a contract claim. The court added that it was simply following guidance provided by the *Allen I* division. While the court considered altering its ruling based on counsel's assurance that he wouldn't imply that the University had breached any promise, it ultimately stood by its ruling. The court clarified, however, that counsel could ask witnesses about how they conduct investigations.

¶ 36     On appeal, Allen contends that the court shouldn't have excluded the policies because they show that the University failed to follow its own policies in terminating Allen, which is evidence of pretext. We agree but find the error harmless.

## 2.     Analysis

¶ 37     In *Allen I,* the division affirmed the dismissal of Allen's breach of contract claim because the University's policies reflect mere aspirational standards that don't impose an enforceable contractual obligation. *See Allen I,* slip op. at ¶¶ 47, 58. But the division also

reversed the grant of summary judgment to the University on Allen's whistleblower claim because, among other things, "the record contain[ed] evidence to support an inference that Margolin 'departed from normal procedures or policies'" in deciding to fire Allen. *Id.* at ¶ 30 (quoting *Johnson*, 662 P.2d at 476). Thus, the *Allen I* division made clear that the University's policies were relevant to the whistleblower claim even though they provided inadequate support for a breach of contract claim.

¶ 38 Like the *Allen I* division, we agree with Allen that the policies were relevant because they could tend to show that the University deviated from its normal procedures when firing Allen, thus supporting the inference that the University gave pretextual reasons for its termination decision. *See Johnson*, 662 P.2d at 466. Although the University argues that most of the subject policies weren't mandatory, a fact finder could infer that even an aspirational policy helped inform historic practices or typical procedures that the University departed from when firing Allen. *See Williams*, ¶¶ 57-59 (affirming pretext finding based on departures from previous chief of police policy and typical polygraph procedures). When coupled with the low bar for relevancy under

CRE 401, we have little difficulty concluding that the policies were at least somewhat relevant to Allen's whistleblower claim.

¶ 39 We also aren't convinced that admitting the policies would have confused the jury. While we recognize that the district court enjoys considerable discretion in deciding whether to exclude evidence under CRE 403, we are also mindful that we must afford the evidence its maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected. *See Holley*, 284 P.3d at 84. Here, the district court believed that admitting the policies would confuse the jury by providing a "backdoor method" for Allen to present his contract claim. But the court had already dismissed Allen's breach of contract claim before trial. Because the court didn't instruct the jury on a breach of contract claim, we fail to see how the jury could have misused the policies to find the University liable on such a claim. *Cf. Qwest Servs. Corp. v. Blood,* 252 P.3d 1071, 1088 (Colo. 2011) ("Absent evidence to the contrary, we presume that a jury follows a trial court's instructions.").

¶ 40 Given this lack of unfair prejudice, we conclude that the district court abused its discretion by excluding the policies. *See*

*Holley*, 284 P.3d at 84 (concluding trial court abused its discretion under CRE 403 when the excluded evidence "presented no particular risk of unfair prejudice").

### 3. Harmlessness

¶ 41    While the district court abused its discretion in excluding the policies, we nonetheless conclude that the error was harmless. *See* C.A.R. 35(c); C.R.C.P. 61.

¶ 42    Allen asserts that the court's erroneous exclusion of the policies prejudiced him in three primary ways. First, he argues that the court's ruling prevented him from showing that the University deviated from its policies encouraging open and effective communication when it failed to tell him about the complaints against him before terminating his employment. Second, Allen contends the court's exclusion of the policies precluded him from arguing that the University's whistleblower policy required him to report King and that the University acted inconsistently with that policy by later terminating his employment. Third, Allen says that, based on the court's ruling, he couldn't argue that the University

departed from its Board of Regents' delegation policy when it failed to provide certain information to the delegate who fired him.[1]

¶ 43    Allen doesn't argue that any of the written policies imposed mandatory obligations on the University. Instead, each of his arguments rests on the assumption that the University deviated from its "normal" practices (which he contends were consistent with its written policies) when firing him. *See Johnson*, 662 P.2d at 476. But admitting the written policies wasn't the sole route to establishing the University's normal practices. To the contrary, Allen had the opportunity to present — and *did* present — substantial other evidence regarding the University's normal practices for handling issues involving employees in Allen's situation. *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289-90 (10th Cir. 2013) (recognizing that pretext can be shown by evidence that the employer departed from an "unwritten policy" or "general practice"); *see also Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) ("An employer's unusual deviation from standard

---

[1] Allen doesn't contest that a Board of Regents delegate terminated him.

procedures can serve as circumstantial evidence of discrimination.").

¶ 44     Allen presented evidence, for example, about whether the University had a general practice of communicating with employees before firing them. Specifically, Allen asked Margolin, Allen's second-level supervisor, whether the University's decision to fire him without first speaking to him informally was consistent with its "practice or procedure." Margolin responded that she "didn't have to sit down with [Allen] at th[at] point" because the University had a "practice that we step back when there's an investigation going on as not to look retaliatory or be retaliatory." Allen also asked Margolin whether, "according to University practices, Mr. Allen had a right to know about the allegations against him." Margolin explained that Allen knew the allegations against him.

¶ 45     Allen also asked Wynne, the HR director, about the University's general investigation practices, including whether the HR department's "functions" entail warning an employee that their job is in jeopardy and ensuring a termination is done properly. Wynne responded that warning the employee falls to the employee's

supervisor, but she agreed that the HR department ensures terminations are completed properly.

¶ 46    Allen himself also testified in response to a juror's question about whether the University had a "clear process" for making "decisions on employment" and, if so, whether that process was "clearly relayed" to him during the time "leading to termination." Allen explained that (1) the University has a "progressive discipline" and "verbal coaching" process for employees; (2) the University applied that process to other employees; and (3) it failed to follow the process when terminating him.  Allen added that, given how the University operated, he was surprised that no one informed him about the complaints against him before it terminated his employment.

¶ 47    The jury also heard evidence regarding the University's general practices involving whistleblowers and whether the University acted inconsistently with those practices.  Allen testified that he had previously read University policies that he believed required him to report King's alleged misconduct.  And yet, according to Allen, the University never interviewed him regarding his whistleblower report against King.

¶ 48    Margolin's testimony similarly revealed that the University changed course when deciding how to respond to Allen's problematic behavior.  She testified that she had been planning to meet with Allen regarding the complaints against him, but she ultimately decided against it after Allen filed his whistleblower report.  She justified her course change by pointing to the University's practice of "step[ping] away" during a whistleblower investigation.  Margolin further explained, in response to a juror question, that the University's practice of "step[ping] back" when an employee files a whistleblower report applies even when the report and the whistleblower's problematic behavior are unrelated.

¶ 49    Wynne similarly testified about the University's practice of avoiding any appearance of retaliation when a whistleblower also has a documented history of performance issues.  And the associate vice chancellor who oversaw Allen's department testified that the University had a general practice of warning the subject of a whistleblower report to not retaliate against the reporting employee.

¶ 50    Finally, Allen cross-examined Margolin about the Board of Regents delegate's normal process for approving terminations, the information she provided to the delegate, and the delegate's process

in approving Allen's termination. Wynne also testified about the University's normal process for relaying information to the delegate on "all termination actions." And the associate vice chancellor testified about the information that he provided, and didn't provide, to the delegate through the chain of command.

¶ 51 In short, the jury heard substantial evidence regarding the University's general practices involving employees in Allen's situation. Given this evidence, we can say with fair assurance that the district court's erroneous exclusion of the written policies didn't affect Allen's substantial rights. *See Schonlaw*, ¶ 11; *see also People v. Bus. or Bus. Located at 2896 W. 64th Ave.*, 937 P.2d 873, 876-77 (Colo. App. 1996) (alleged error harmless when ample evidence on the issue was elicited from other sources).

## D. Comparator Employee

¶ 52 Allen next contends that the district court erred by excluding evidence that the University treated a comparator employee differently, and more favorably, than Allen during the process leading up to termination.

¶ 53 During trial, Allen made an offer of proof that the University gave the comparator an opportunity to share their side of the story

before it fired them, but it didn't afford Allen a similar opportunity. The University objected and argued that the comparator wasn't similarly situated because they were investigated and terminated for alleged sexual harassment. The court sustained the objection, finding the comparator evidence was both irrelevant and inadmissible under CRE 403.

¶ 54    We discern no abuse of discretion in the district court's exclusion of the comparator evidence on relevancy grounds. *See* CRE 402. The comparator wasn't similarly situated, and therefore not relevant, because the University was obligated to follow procedures dictated by federal law, laid out in Title IX, when investigating the sexual harassment allegations levied against the comparator. *See* 20 U.S.C. § 1682 (empowering federal agencies to issue rules and regulations related to sex discrimination in education programs); 34 C.F.R. §§ 106.44-106.46 (2025) (describing mandatory grievance procedures an education institution must follow when it receives allegations of sex discrimination, including sex-based harassment).

¶ 55    The complaints against Allen, by contrast, weren't governed by Title IX. As a result, Allen wasn't similarly situated to the

comparator. *See St. Croix,* 166 P.3d at 240-41 (plaintiff not similarly situated to comparator because plaintiff was on probation and subject to different standards than comparator); *see also Morrow v. Wal-Mart Stores, Inc.,* 152 F.3d 559, 562 (7th Cir. 1998) (plaintiff not similarly situated to comparator because plaintiff was accused of sexual harassment while comparator wasn't).

## IV.    Costs

¶ 56    Allen also contends that the district court erred by awarding the University the full amount of its requested costs.

¶ 57    After prevailing at trial, the University requested $20,743.34 in costs under C.R.C.P. 54(d).  The University also pointed to the offer of judgment statute, § 13-17-202, C.R.S. 2025, arguing it had served Allen a statutory offer of settlement more than fourteen days prior to trial, Allen had rejected the offer, and Allen didn't subsequently recover more than the University's offer.  The district court found that the University's requested costs were reasonable and therefore awarded it the full amount.

¶ 58    On appeal, Allen contends that (1) a cost award of more than $20,000 for a three-day trial is "patently unreasonable"; (2) the defense team's travel costs were unreasonable because the team

was overstaffed and stayed too many nights in hotels, mileage costs were inconsistent and unnecessary, and meal expenses aren't awardable under our precedent; (3) costs for Tide stain remover sticks and printer ink were unreasonable; and (4) costs for exhibit tabs and binders were excessive. We aren't persuaded.

¶ 59 We review a district court's award of costs for an abuse of discretion. *Valentine v. Mountain States Mut. Cas. Co.*, 252 P.3d 1182, 1187 (Colo. App. 2011). Subject to exceptions not applicable here, the prevailing party in a civil case is generally entitled to recover its "reasonable costs." C.R.C.P. 54(d); *see Ute Water Conservancy Dist. v. Fontanari*, 2022 COA 125M, ¶ 84.

¶ 60 In addition, if a defendant extends a written settlement offer more than fourteen days before trial that is rejected by the plaintiff, and the plaintiff then fails to recover at trial more than the amount offered, the defendant is entitled to recover its "actual costs" that accrued after the offer of settlement. § 13-17-202(1)(a)(II). The actual costs awarded under this statute must be reasonable. *Catlin v. Tormey Bewley Corp.*, 219 P.3d 407, 415 (Colo. App. 2009).

¶ 61 As the outset, Allen's general contention that the court's cost award is unreasonable for a three-day trial isn't sufficiently specific.

Therefore, we won't address it. *See Valentine*, 252 P.3d at 1187 n.1 ("[T]he size of the award is insufficient, standing alone, to show an abuse of discretion.").

¶ 62    In addition, Allen's second and third contentions — regarding the defense team's travel costs and the costs for the Tide remover sticks and printer ink — are unpreserved. In his response to the University's bill of costs, Allen argued only that a cost award for the defense team's travel costs wasn't authorized by statute. He didn't argue that defense team's travel costs were unreasonable or unauthorized by our case law. And he didn't challenge the expenses for Tide sticks or printer ink at all. Because Allen didn't preserve those arguments, we won't address them. *See id.* at 1192 ("The Valentines did not raise their first and second arguments below, and therefore we will not address them.").

¶ 63    Allen did, however, preserve his fourth contention that the University's costs for binders and tabs were unreasonable, arguing that the University may reuse those supplies after trial. But the district court concluded that those costs were reasonable because the University wouldn't have incurred them but for the trial. We perceive no abuse of discretion in the court's reasoning. *See id.* at

26

1195-96 (court properly awarded costs that were incurred "due to litigation and in preparation for trial"); *cf. Moye White LLP v. Beren,* 2013 COA 89, ¶ 42-44 (costs that assisted counsel in "efficiently preparing for trial" were properly awarded even though the claimed expenses were for items not used at trial).

## V. Disposition

¶ 64　　We affirm the judgment and the order awarding the University its costs.

JUDGE WELLING and JUDGE GOMEZ concur.